**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § | |
| Plaintiff, | § | Case No. 3:10-cv-1394 |
| v. | § | |
| RONALD WIESELBERG, ET AL. | § | |
| Defendants. | § | |

**RECEIVER'S COMPLAINT**
**AGAINST CERTAIN FORMER STANFORD EMPLOYEES**
**WHO INVESTED IN SIBL CDS**

The Receiver, Ralph S. Janvey, (the "Receiver") hereby files this Complaint Against Certain Former Stanford Employees Who Invested in SIBL CDs (the "Complaint"), stating as follows:

## SUMMARY

1. The ultimate purpose of this Receivership is to make the "maximum disbursement to claimants." This requires the Receiver to maximize the pool of assets that will be available for distribution. To accomplish this, the Receiver must take control of all assets of the Estate and traceable to the Estate, "wherever located," including money stolen from investors through fraud.

2. The Receiver's investigation to date reveals that CD sales generated substantially all of the income for the Stanford Defendants and the many related Stanford entities. Revenue, let alone any profit, from all other activities and investments was miniscule in comparison. Money that new investors were deceived into paying to purchase CDs funded the Stanford

network; lavish offices and appointments; extravagant lifestyles for the individual defendants and their families; employees' salaries; Loans, SIBL CD commissions, SIBL Quarterly Bonuses, Performance Appreciation Rights Plan ("PARS") Payments, Branch Managing Director Quarterly Compensation, and Severance Payments to financial advisors, managing directors, and other Stanford employees; and CD proceeds in the form of purported CD interest payments, CD redemptions, and other payments ("CD Proceeds") to Stanford investors, including the Former Employee Investors named in the concurrently filed Appendix (the "Former Employee Investors").

3. The Former Employee Investors listed on pages 1 and 2 of the Appendix are former Stanford employees who invested in SIBL CDs. Each of them received Proceeds from their CDs in the amounts listed in the Appendix column entitled "Total Proceeds from Former Employee Investor's CD(s)." Collectively, these 77 Former Employee Investors received over $27 million in CD Proceeds, at least.

4. The CD Proceeds the Former Employee Investors received from SIBL were not, in fact, their actual principal or interest earned on the funds they invested. Instead, the money used to make those payments came directly from the sale of SIBL CDs to other investors.

5. When Stanford paid CD Proceeds to the Former Employee Investors, he did no more than take money out of other investors' pockets and put it into the hands of the Former Employee Investors. For the more than 20,000 investors who have thus far received little or nothing from their investment in Stanford CDs, money recovered from wherever it resides today is likely the largest portion of the money they will ever receive in restitution. CD Proceeds — comprising purported CD principal redemptions, interest payments, and other payments to the

Former Employee Investors — are little more than stolen money and do not belong to the Former Employee Investors who received such funds but belong, instead, to the Receivership Estate.

6. At this stage of the Receivership, the Receiver has identified substantial sums of CD Proceeds paid to the Former Employee Investors and, through this Complaint, seeks the return of those funds to the Receivership Estate in order to make an equitable distribution to claimants.[1] At a minimum, the Former Employee Investors named in the Appendix received over $27 million in CD Proceeds.

7. The Receiver seeks an order that: (a) CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs were fraudulent transfers or, in the alternative, unjustly enriched the Former Employee Investors; (b) CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) each of the Former Employee Investors is liable to the Receivership Estate for an amount equaling the CD Proceeds he or she received; and (d) awards attorney's fees, costs, and interest to the Receiver.

## PARTIES

8. The parties to this Complaint are the Receiver and the Former Employee Investors named in the Appendix filed concurrently herewith.

9. The named Former Employee Investors will be served pursuant to the Federal Rules of Civil Procedure, through their attorneys of record, or by other means approved by order of this Court.

[1] The Receiver's claims in this Complaint are related to his claims on file in Case No. 03:09-CV-0724-N before this Court.

**JURISDICTION & VENUE**

10. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

11. Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

12. Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 29 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed.

13. Further, any of the Former Employee Investors who submitted an Application for Review and Potential Release of Stanford Group Company ("SGC") Brokerage Accounts made the following declaration: "By filing this application, I submit to the exclusive jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division and irrevocably waive any right I or any entity I control may otherwise have to object to any action being brought in the Court or to claim that the Court does not have jurisdiction over the matters relating to my account."

14. Further, any of the Former Employee Investors who filed motions to intervene in *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-cv-298-N, have consented as a matter of law to the Court's personal jurisdiction. *See In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006); *County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002); *Pharm. Research & Mfrs. v. Thompson*, 259 F. Supp. 2d 39, 59 (D.D.C. 2003); *City of Santa Clara v. Kleppe*, 428 F. Supp. 315, 317 (N.D. Ca. 1976).

## STATEMENT OF FACTS

15. On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), SGC, and Stanford Capital Management, LLC (collectively, the "Stanford Defendants"). On the same date, the Court entered an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

16. As alleged by the SEC, the Stanford Defendants marketed fraudulent SIBL CDs to investors exclusively through SGC financial advisors pursuant to a Regulation D private placement. SEC's Second Amended Complaint (Doc. 952), ¶ 27.[2] The CDs were sold by Stanford International Bank, Ltd. *Id*.

17. The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning. Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio"). In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

---

[2] Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

18. In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIBL's consistent, double-digit returns on its investment portfolio. SEC's Second Amended Complaint (Doc. 952) at ¶¶ 32-33.

19. In its brochure, SIBL told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit." SIBL also emphasized that its "prudent approach and methodology translate into deposit security for our customers." *Id*. ¶ 34. Further, SIBL stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors." *Id*.

20. In its 2006 and 2007 Annual Reports, SIBL told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id*. ¶ 35. More specifically, SIBL represented that its year-end 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals, and 15.6% alternative investments. *Id*.

21. Consistent with its Annual Reports and brochures, SIBL trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id*. ¶ 36. In training materials, the Stanford Defendants also claimed that SIBL had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id*. ¶ 49.

22. Contrary to the Stanford Defendants' representations regarding the liquidity of its portfolio, SIBL did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by Defendant Allen Stanford and were either placed in speculative investments (many of them illiquid, such as

private equity deals), diverted to other Stanford Entities "on behalf of shareholder" - *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.). In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford. *Id*. ¶¶ 39-40.

23. In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIBL's investment portfolio. *Id*. ¶ 4.

24. SIBL's financial statements, including its investment income, were fictional. *Id*. ¶ 4, 53. In calculating SIBL's investment income, Defendants Stanford and James Davis provided to SIBL's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id*. Using this pre-determined number, SIBL's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIBL did not actually earn. *Id*.

25. CD Proceeds from the Ponzi scheme were transferred by the Stanford Defendants to the Former Employee Investors solely for the purpose of concealing and perpetuating the fraudulent scheme. Such CD Proceeds were paid to the Former Employee Investors from funds supplied by other investors who bought the fraudulent CDs.

26. For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIBL CDs to make purported interest and redemption payments on pre-existing CDs. *See id*. ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

## REQUESTED RELIEF

27. This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2. The Receiver seeks the relief described below in this capacity.

28. Paragraph 4 of the Order Appointing Receiver, entered by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c).

29. One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants. *See* Amended Order Appointing Receiver (Doc. 157) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004). But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. Doc. 157 ¶ 5(b).

30. The Former Employee Investors named in the Appendix received money that was not a return on an investment placed with a legitimate bank. In reality, the money the Former Employee Investors received was not their money, was not a return on their investments, and was not generated by any of SIBL's other business ventures. The CD Proceeds were simply money that came from the more than 20,000 CD holders who were deceived into purchasing CDs and who by chance, or as the result of sales tactics by Stanford financial advisors and other employees, had not withdrawn funds from SIBL as of the date the Receivership was put in place. The Former Employee Investors' CD Proceeds must be returned to the Receivership Estate to compensate victims of the Stanford fraud according to principles of law and equity.

31. The Former Employee Investors received CD Proceeds ranging in amounts from approximately $52,000 to over $3 million. *See* App. at "Total Proceeds from Former Employee Investor's CD(s)" column. These Former Employee Investors received, at a minimum, the CD Proceeds amounts associated with their names in the Appendix. *See id.* Collectively, the Former Employee Investors received more than $27 million in CD Proceeds, at least. *See id.* at 2.

***I. The Receiver is Entitled to Disgorgement of CD Proceeds Fraudulently Transferred to the Former Employee Investors.***

32. The Receiver is entitled to disgorgement of all CD Proceeds paid to the Former Employee Investors because such payments constitute fraudulent transfers under applicable law. The Stanford Defendants transferred the CD Proceeds to the Former Employee Investors with actual intent to hinder, delay, or defraud their creditors; as a result, the Receiver is entitled to the disgorgement of those CD Proceeds from the Former Employee Investors.

33. The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v.*

*Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006). The uncontroverted facts establish that the Stanford Defendants were running a Ponzi scheme and, to keep the scheme going, paid the Former Employee Investors with CD Proceeds taken from other SIBL CD investors. The Receiver is, therefore, entitled to disgorgement of the fraudulently transferred CD Proceeds that the Former Employee Investors received.

34. Consequently, the burden is on the Former Employee Investors to establish an affirmative defense, if any, of both objective good faith and provision of reasonably equivalent value. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 ("A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration.") (emphasis in original); *see also Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly."). The Receiver is, therefore, entitled to recover the full amount of CD Proceeds that the Former Employee Investors received, unless the Former Employee Investors prove *both* objective good faith *and* reasonably equivalent value.

35. The good-faith element of this affirmative defense requires that the Former Employee Investors prove objective — not subjective — good faith. *Warfield v. Byron*, 436 F.3d 551, 559-560 (5th Cir. 2006) (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard. The relevant inquiry is what the transferee objectively knew or should have known instead of

examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

36. Moreover, under applicable fraudulent transfer law, the Receiver is entitled to attorney's fees and costs for his claims against the Former Employee Investors. *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 24.013 (Vernon 2009) ("[T]he court may award costs and reasonable attorney's fees as are equitable and just."). As a result, the Receiver requests reasonable attorney's fees and costs for prosecuting his fraudulent-transfer claims against the Former Employee Investors.

37. In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of all CD Proceeds received by the Former Employee Investors.

38. The Stanford Defendants, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the Former Employee Investors with actual intent to hinder, delay, or defraud their creditors. The Receiver is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to the Former Employee Investors. Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that the CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs were fraudulent transfers; (b) ordering that CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) ordering that each of the Former Employee Investors is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received; and (d) awarding attorney's fees, costs, and interest to the Receiver.

***II. In the Alternative, the Receiver is Entitled to Disgorgement of CD Proceeds from the Former Employee Investors under the Doctrine of Unjust Enrichment.***

39. In the alternative, the Receiver is entitled to disgorgement of the CD Proceeds paid to the Former Employee Investors pursuant to the doctrine of unjust enrichment under applicable law. The Former Employee Investors hold CD Proceeds they obtained as a result of taking undue advantage, and such CD Proceeds in equity and good conscience belong to the Receivership for ultimate distribution to the defrauded investors.

40. In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of all CD Proceeds received by the Former Employee Investors.

41. The Former Employee Investors have been unjustly enriched by their receipt of CD Proceeds. Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that each of the Former Employee Investors was unjustly enriched by CD Proceeds received directly or indirectly from fraudulent CDs; (b) ordering that CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; and (c) ordering that each of the Former Employee Investors is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received; and (d) awarding attorney's fees, costs, and interest to the Receiver.

**PRAYER**

42. The Receiver respectfully requests the following:

(a) An Order providing that CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs were fraudulent transfers under applicable law or, in the alternative, that the Former Employee

Investors were unjustly enriched by CD Proceeds received directly or indirectly from fraudulent CDs;

(b) An Order providing that CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs are property of the Receivership Estate;

(c) An Order providing that CD Proceeds received directly or indirectly by the Former Employee Investors from fraudulent CDs are subject to a constructive trust for the benefit of the Receivership Estate;

(d) An Order establishing the amount of CD Proceeds each of the Former Employee Investors received;

(e) An Order providing that each of the Former Employee Investors is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received from fraudulent CDs;

(f) An award of costs, attorneys' fees, and prejudgment and post-judgment interest; and

(g) Such other and further relief as the Court deems proper under the circumstances.

Dated: July 16, 2010

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On July 16, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve the Former Employee Investors individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler